IN THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| ALEXANDER FRIEDMANN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. |
| v. | ) | |
| | ) | JURY DEMAND |
| TONY PARKER, | ) | |
| TONY MAYS, | ) | |
| MICHAEL KEYS, | ) | |
| GEORGE FIRESTINE; and | ) | |
| CELESTA WILLIAMS | ) | |
| In their individual | ) | |
| and official capacities | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

For the past 18 months, Plaintiff Alexander Friedmann, a pretrial detainee, has been housed in a special "iron man" cell in the Supermax unit of a state prison, under conditions of confinement that are extremely restrictive, punitive, and harsher than conditions of maximum-security Death Row prisoners. Plaintiff has been classified to remain in maximum-security confinement under such punitive conditions indefinitely and under policies that do not include the due process protections afforded to convicted prisoners. As a result of Plaintiff's prolonged housing in such restrictive and punitive conditions in the "iron

man" cell, he has suffered both physical and mental injuries, including weight loss of up to 40 pounds; vision problems; back pain; and depression. Plaintiff alleges violations of his due process rights under the Fourteenth Amendment for being subjected to punitive conditions of confinement prior to an adjudication of guilt; and for being placed in indefinite maximum-security housing in the "iron man" cell in a Supermax unit without due process.

Plaintiff brings this suit pursuant to 42 USC § 1983. The Defendants are named in their official capacities with respect to Plaintiff's claims for declaratory and injunctive relief and in their individual capacities with respect to Plaintiff's claims for damages.

## PARTIES

1. Plaintiff, Alexander Friedmann, is and was a pretrial detainee incarcerated at the Riverbend Maximum Security Institution (RMSI), a state prison, at all times relevant to this Complaint.

2. Defendant Tony Parker, Commissioner of the Tennessee Department of Correction (TDOC), is responsible for promulgating and approving TDOC policies, including policies that apply to pretrial detainees in state custody, such as Plaintiff. Defendant Parker is also responsible for responding to grievance appeals at the Commissioner's level of review; and is the final authority with respect to TDOC operations, including classification and security.

3. Defendant Tony Mays, the warden at RMSI, is responsible for all operations at that facility, including the approval of classification decisions related to Plaintiff; enforcement of TDOC policies; and responding to grievances at the Warden's level of review.

4. Defendant Michael Keys was Plaintiff's Unit Manager at RMSI until late April 2020, and was responsible for operations within the unit where Plaintiff was confined, including cell changes. Defendant Keys was subsequently promoted to Associate Warden

3

of Treatment at RMSI. In that position, he is a member of the Classification Committee that makes classification decisions related to Plaintiff.

5. Defendant George Firestine, Plaintiff's Unit Manager at RMSI, was responsible for operations within the unit where Plaintiff is confined, including cell changes.

6. Defendant Celesta Williams, Plaintiff's counselor at RMSI, was a member of the Classification Committee that makes classification decisions related to Plaintiff.

7. All defendants have acted and continue to act under color of state law at all times relevant to this complaint.

## JURISDICTION

8. This action arises under the United States Constitution and under the laws of the United States of America, particularly under the provisions of the Fourteenth Amendments of the United States Constitution, and particularly under the Civil Rights Act, codified at 42 U.S.C. § 1983 et seq.

9. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because all the events giving rise to Plaintiff's claims occurred in this District.

## FACTUAL BACKGROUND

11.     On February 18, 2020, after learning that a warrant had been issued for his arrest, Plaintiff turned himself in to police officers and was placed in the custody of the Davidson County Sheriff's Office (DCSO) on a charge of vandalism, a non-violent offense.

12.     Previously, Plaintiff had been released on bond, following charges for attempted burglary, tampering with evidence, and possession of burglary tools—all non-violent offenses.

13.     Plaintiff is accused of vandalizing the DCSO's downtown detention center, a county jail, including using power tools to conceal handcuff keys, firearms, and other contraband items at the jail.

14.     On February 19, 2020, pursuant to TCA § 41-4-121, the DCSO transferred Plaintiff to the custody of the Tennessee Department of Correction (TDOC) as a pretrial detainee "safekeeper."   Plaintiff

was incarcerated at the Riverbend Maximum Security Institution (RMSI) in Nashville.

15.     Plaintiff was searched upon his arrival at RMSI and was not found to have any handcuff keys, firearms, power tools, or other contraband.

16.     RMSI has two housing units for medium and minimum-security prisoners who perform work at the facility (Units 5 and 6); a unit for close-security prisoners (Unit 4); a maximum-security unit (Unit 3); a unit that houses prisoners sentenced to death (Unit 2); and a Supermax unit with the most restrictive security features and policies at RMSI (Unit 1).

17.     Unit 1 at RMSI consists of four housing pods (A, B, C, and D), each containing 24 cells, for a total of 96 cells.

18.     At the time Plaintiff arrived at RMSI on February 19, 2020, until mid-November 2020, the 96 cells in Unit 1 at RMSI included 94 regular cells and two cells commonly known and referred to by both prisoners and prison staff as "steel" or "iron man" cells. Only Unit 1 had "iron man" cells.

19.     Unlike the regular cells in Unit 1, the "iron man" cells have no shelves to store personal belongings (which mostly must be put on the floor); no electric outlet (and thus no ability to use basic appliances such as televisions and lamps); no steel wall mirror for personal grooming; no table to write on; and no stool to sit on.

20.     Unlike the regular cells in Unit 1, the "iron man" cells have beds that consist of a bench made of steel plates that extend from side to side along the back wall.

21.     Unlike the regular cells in Unit 1, the walls and ceilings of the "iron man" cells are covered in welded steel plates. Because the steel plates absorb and retain cold temperatures, both from the outside climate and the air conditioning inside the unit, the "iron man" cells stay colder than regular cells in Unit 1, particularly during the winter months.

22.     The "iron man" cells have a vertical slit window less than 2" wide, which is half the size of the windows in the regular cells in Unit 1. Further, unlike the regular cells, the "iron man" cells are painted dark gray rather than white. The smaller window admits

less light than in the regular cells; and the darker paint makes the room overall poorly lit and darker in comparison to regular cells.

23. The "iron man" cells contain only a steel-plate bench for a bed; a steel combination sink and toilet; a shower head mounted on one wall and a drain in the floor; poor lighting because of the small window and dark paint; and colder temperatures than in regular cells.

24. Upon his arrival at RMSI as a pretrial detainee "safekeeper," Plaintiff was immediately placed in cell C-105, one of the two "iron man" cells in Unit 1, the Supermax unit. Except for a six-day stint in federal custody and a two-week quarantine period in RMSI's medical unit, Plaintiff has remained housed in the iron man cell in Unit 1 for the past 18 months.

25. Upon information and belief, the decision to place and continue to house Plaintiff in the iron man cell in Unit 1 was made by Defendant Parker and approved by Defendant Mays.

26. Plaintiff has remained in the "iron man" cell in Unit 1 due to classification recommendations and decisions made by Defendants

Williams, Keys, and Mays to classify Plaintiff to mandatory segregation.

27.     The "iron man" cells are typically used to punish prisoners who commit serious disciplinary infractions or have serious behavioral problems; and the punitive nature of the iron man cells is widely known by RMSI prisoners and staff.

28.     Plaintiff has not committed any disciplinary infractions while housed at RMSI; and he has no history of institutional violence, escape, or attempted escape.

29.     The conditions of Plaintiff's confinement in the "iron man" cell in Unit 1 constitute punishment or are punitive in nature.

30.     In addition to the conditions of the iron man cells described above, Plaintiff has also been subject to the conditions and policies that apply to all prisoners housed in Unit 1, the Supermax unit.

31.     Unit 1 is a solitary confinement / segregation unit, where each prisoner is housed alone in individual cells. All prisoners, including Plaintiff, remain in their cells 23 hours a day on weekdays and 24 hours a day on weekends and holidays, with minimal interaction with other people.

32.     Although prisoners in Unit 1 are supposed to receive one hour of recreation time Monday through Friday in individual outdoor-recreation cages, in practice (because of staff shortages, lockdowns, and other factors), prisoners in Unit 1, including Plaintiff, usually receive outdoor recreation only two to three times a week.

33.     The only recreation equipment in each outdoor-recreation cage in Unit 1 is a pull-up bar.  Plaintiff is unable to use a pull-up bar because of prior surgery for a torn rotator cuff.

34.     Because he is housed in Unit 1, whenever Plaintiff leaves his cell, he is restrained with handcuffs, leg shackles, a tether leash, and sometimes a waist chain.

35.     Because he is housed in Unit 1, Plaintiff is limited to non-contact visits with attorneys, clergy, and his immediate family members.

36.     Because he is housed in Unit 1, Plaintiff is restricted in the items he can purchase from the RMSI commissary.  For example, Plaintiff cannot purchase toothpaste, shaving products, conditioner, skin lotion, a plastic bowl, a plastic cup, or eye drops.

37. Although the inmate handbook Plaintiff received states prisoners in Unit 1 may have in-cell arts and crafts, Defendant Williams told Plaintiff that in-cell arts and crafts are not allowed.

38. Plaintiff has repeatedly requested to be moved out of the "iron man" cell, where he has been housed since his arrival at RMSI.

39. Specifically, Plaintiff asked Defendant Keys to be moved out of the "iron man" cell in Unit 1 on March 18; March 25; April 13; April 25; and October 27, 2020. Plaintiff asked Defendant Firestine to be moved out of the "iron man" cell on May 12; May 25; June 30; August 4; September 7; and October 8, 2020. Plaintiff asked Defendant Mays to be moved out of the iron man cell on April 9, 2021. Plaintiff asked Defendant Parker to be moved out of the iron man cell on April 22, 2021. All of Plaintiff's requests were denied or ignored.

40. Defendants Keys, Firestine, Williams, Parker and Mays were aware of Plaintiff's status as a pretrial detainee safekeeper and were aware of the extremely restrictive and punitive conditions in the "iron man" cell and in Unit 1.

41.     Plaintiff filed a grievance concerning the punitive conditions of confinement in the "iron man" cell where he was housed and requested to be moved.  His grievance was determined to be non-grievable; that decision was upheld by Defendant Mays; and further upheld on appeal to Defendant Parker.  Plaintiff has exhausted the grievance process with respect to this issue.

42.     Upon information and belief, the only prisoner who has been housed in an "iron man" cell longer than Plaintiff is Curtis Ray Watson, a convicted TDOC prisoner accused of sexually assaulting and murdering TDOC administrator Debra Johnson after his escape from a state prison in August 2019.  Mr. Watson was housed in an "iron man" cell in B pod in Unit 1, until recently, when he was moved.

43.     Plaintiff and Mr. Watson occupied the only two "iron man" cells in Unit 1 from February 19, 2020, to mid-November 2020. During that time, other prisoners who committed serious disciplinary infractions, including setting fires in their cells; flooding their cells; and assaulting prison staff members, were **not** placed in "iron man" cells because TDOC staff, including

Defendants Firestine, Keys, Mays, and Parker, refused to move Plaintiff and Mr. Watson out of the only two "iron man" cells in Unit 1 during that time period.

44.　　In mid-November 2020, TDOC staff began converting additional cells in Unit 1 into "iron man" cells. Plaintiff was informed by a TDOC maintenance worker that additional cells were being converted into "iron man" cells in B and C pods so they would have somewhere to put prisoners for disciplinary purposes, since Plaintiff and Mr. Watson would not be moved from the "iron man" cells where they were housed. Following the cell conversions in November 2020, Unit 1 now has four "iron man" cells and 92 regular cells.

45.　　From January 20 to January 26, 2021, Plaintiff was in federal custody at a county jail in Kentucky, the Grayson County Detention Center ("GCDC").

46.　　While held at GCDC, Plaintiff was housed in a communal cell with 9 to 15 other prisoners. He was not placed in solitary confinement; was not designated maximum-security; and was not placed in restraints when leaving the cell, which occurred daily.

13

The cell at GCDC had an electrical outlet and television. Plaintiff was housed at GCDC without incident.

47.     Upon his return to RMSI from GCDC, Plaintiff was housed in the prison infirmary during a 14-day quarantine period. While in the infirmary, Plaintiff was held in a standard medical cell with a regular-sized window; a mirror; an electrical outlet; and an enclosed shower. He was held in the infirmary without incident. Following the quarantine, Plaintiff was returned to an "iron man" cell in Unit 1 where he has remained ever since.

48.     Plaintiff's housing at GCDC and the RMSI infirmary indicate that he can be safely and securely housed in conditions other than maximum security, in a Supermax unit, or in an "iron man" cell.

49.     The decisions of Defendants Williams, Firestine, Keys, Mays, and Parker to keep Plaintiff in mandatory segregation (maximum security) and in the "iron man" cell, constitute an exaggerated response to any legitimate security concerns they may have related to Plaintiff's incarceration at RMSI.

50.     Upon information and belief, condemned prisoners on Death Row in Unit 2 at RMSI are housed in cells that have stools, tables,

shelves, mirrors, regular size windows, and electric outlets so they can watch television and use other plug-in appliances, unlike the conditions in the "iron man" cell where Plaintiff, a pretrial detainee, is housed.

51.     Upon information and belief, condemned prisoners on Death Row in Unit 2 at RMSI have access to handball and exercise equipment in their recreation areas; have access to in-cell arts and crafts; and have access to the full RMSI commissary list, unlike Plaintiff, a pretrial detainee.

52.     Upon information and belief, Plaintiff, a pretrial detainee charged with non-violent offenses, with no history of institutional violence or escape, and who has not committed any disciplinary infractions at RMSI, is being housed in the "iron man" cell in Unit 1 under conditions of confinement that are harsher and more restrictive and punitive than the conditions on Death Row.

53.     Plaintiff has suffered physical and mental injuries due to his indefinite and prolonged confinement in the "iron man" cell in Unit 1. Plaintiff has experienced stress and anxiety that, along with deficient meals, have contributed to his weight loss of up to 40 lbs.

He has experienced insomnia resulting in fatigue, memory loss, and loss of concentration. He has experienced extremely cold temperatures due to the steel-plate walls and ceiling. He has experienced depression and, as a result, has been placed on anti-depressant medication for the first time in his life. (His medication was later doubled in July 2021, indicating that his mental health condition is worsening while being held in his current conditions of confinement.) As stated below, he has experienced physical injuries and diminished quality of life over the past 18 months.

54.     At the time of this filing, Plaintiff, a pretrial detainee, has been held in extremely restrictive and punitive conditions of confinement in an "iron man" cell in Unit 1 at RMSI, as described above, for 18 months.

55.     The physical and mental injuries that Plaintiff has suffered resulted from the decisions of Defendants Williams, Firestine, Keys, Mays, and Parker to keep Plaintiff in mandatory segregation (maximum security) in Unit 1 and/or not to move him out of the "iron man" cell.

56.     The security classification process for pretrial detainee safekeepers is set forth in TDOC policies 404.11 and 401.05.

57.     TDOC policy 404.11 (**Exhibit 1**) states that safekeepers may be placed in mandatory segregation (maximum security) for five specified reasons, none of which apply to Plaintiff.

58.     TDOC policy 401.05 (**Exhibit 2**) states a classification committee that includes the safekeeper's assigned counselor and the Associate Warden of Treatment shall make classification recommendations for safekeepers.  Defendant Williams was Plaintiff's counselor; and Defendant Keys is the Associate Warden of Treatment at RMSI.  Classification decisions are approved or denied by the RMSI Warden, Defendant Mays.

59.     As members of the classification committee, Defendants Williams and Keys have consistently recommended that Plaintiff remain in mandatory segregation (maximum security).  Defendant Mays has consistently approved Plaintiff's continued placement in mandatory segregation.

60.     As a result of the classification decisions by Defendants Williams, Keys, and Mays, Plaintiff has remained confined in the

"iron man" cell in Unit 1 at RMSI under extremely restrictive and punitive conditions, since his arrival at RMSI.

61.     Defendants Williams, Keys, and Mays have never informed Plaintiff of the basis or reasons for their classification recommendations and decisions regarding his placement in mandatory segregation.

62.     TDOC policy 401.05 does not require safekeepers to be notified of or present during classification reviews, and Plaintiff has never been notified of or allowed to participate in such reviews.

63.     TDOC policy 401.05 does not use an objective, points-based system to determine classification scores, recommendations, or decisions.  Rather, 401.05 uses subjective criteria.

64.     TDOC policy 401.05 has no provisions whereby safekeepers can appeal classification decisions, including indefinite housing in mandatory segregation or "iron man" cells.

65.     The classification process for convicted TDOC prisoners is set forth in TDOC policy 401.08 and the TDOC's Classification User's Guide (**Exhibit 3**), which state convicted prisoners receive due process protections, including: notification of classification

18

hearings; the opportunity to attend and participate in such hearings; that classification decisions are based on an objective, points-based system; and that classification decisions can be appealed.

66. Under TDOC policy 401.08, convicted TDOC prisoners receive more due process protections in the classification process than safekeepers receive under TDOC policy 401.05. Plaintiff has been classified by Defendants Williams, Keys, and Mays to remain in indefinite mandatory segregation absent the due process protections afforded to convicted TDOC prisoners.

67. Pursuant to TDOC policies 404.11 and 401.05, Plaintiff has been classified to remain in indefinite mandatory segregation absent the due process protections afforded to convicted TDOC prisoners.

68. TDOC policies 404.11 and 401.05 were promulgated and approved by Defendant Parker.

69. Plaintiff filed a grievance concerning the lack of due process in his classification. His grievance was determined to be non-grievable; that decision was upheld by Defendant Mays and, on

appeal, to Parker. Plaintiff has thus exhausted the grievance process with respect to this issue.

70. The bed in the "iron man" cell in Unit 1, where Plaintiff has been housed since his arrival at RMSI, is a steel-plate bench, unlike in regular cells.

71. Prior to his incarceration, Plaintiff suffered a herniated disc that required emergency room care and follow-up medical treatments, including intra-spinal steroid injections.

72. Shortly after being housed in the "iron man" cell in Unit 1 at RMSI, Plaintiff began experiencing back pain from sleeping on the steel-plate bench on a standard plastic-covered prison mattress.

73. Plaintiff repeatedly requested medical care for his back pain, including submitting sick call or inmate request forms on March 23; April 2; April 12; April 28; May 12; September 10; September 28; and November 2, 2020; and on January 18, 2021.

74. Plaintiff received a thin foam mattress from the medical department on June 10, 2020—100 days after first requesting care for his back pain. Plaintiff's back pain was a direct result of the decisions made by Defendants to house Plaintiff in Unit 1, in an

"iron man" cell. His back pain was serious, interrupting his sleep, and has not been resolved by the use of the foam mattress.

75.     Requiring Plaintiff to sleep on a steel-plate bench in the "iron man" cell, which has resulted in ongoing back pain, constitutes punishment and is punitive in nature.

76.     The "iron man" cell in Unit 1 is painted dark gray and has a window half the size of windows in regular cells, resulting in poor lighting conditions relative to regular cells. The electric light in the cell provides poor illumination because of the dark paint and the small window.

77.     As a result of such poor lighting conditions, Plaintiff, who wears prescription eyeglasses, has experienced vision problems— including eye strain, blurred vision, headaches, and difficulty reading.

78.     Plaintiff has repeatedly requested eye care / optometry service for his vision problems, including submitting sick call or inmate request forms on April 20, July 13, August 25, September 10, September 28, 2020, and March 26, 2021.

79.     During an appointment with a medical doctor at RMSI on March 2, 2021, Plaintiff was told it would take up to a year before he receives vision / optometry care.

80.     The poor lighting conditions in the "iron man" cell, which resulted in Plaintiff's vision problems, constitute punitive housing conditions.

81.     Plaintiff's housing in such extreme and restrictive conditions of confinement constitutes a completely exaggerated and unnecessary response to whatever legitimate penological interests Defendants may have with respect to Plaintiff.

82.     Plaintiff is aware that prisoners who have committed murder and are serving life sentences are housed in general population at RMSI (Units 5 or 6).

83.     Plaintiff is aware that prisoners who have histories of disciplinary offenses are housed in general population at RMSI (Units 5 or 6).

## CAUSE OF ACTION

### 1. Violation of Plaintiff's Due Process Rights (42 USC § 1983)

84.     Plaintiff reincorporates all above paragraphs.

85.     Plaintiff's housing in the "iron man" cell in Unit 1 at RMSI, and in solitary confinement, or mandatory segregation, constitutes punitive conditions of confinement in violation of his due process rights under the Fourteenth Amendment.

86.     Defendants Williams and Keys violated Plaintiff's due process rights by making classification decisions that resulted in Plaintiff's being housed in punitive conditions of confinement prior to an adjudication of guilt and despite Plaintiff's repeated requests to be moved.

87.     Defendant Mays violated Plaintiff's due process rights by approving classification decisions that resulted in Plaintiff's being housed in punitive conditions of confinement prior to an adjudication of guilt.

88.     Defendants Firestine, Keys, and Mays violated Plaintiff's due process rights by failing to move Plaintiff to non-punitive conditions of confinement, despite having knowledge that Plaintiff was being

housed in punitive conditions prior to an adjudication of guilt and despite Plaintiff's repeated requests to be moved.

89.     Defendants Mays and Parker violated Plaintiff's due process rights by ordering and/or approving Plaintiff's continued housing in punitive conditions of confinement prior to an adjudication of guilt.

90.     Defendant Parker violated Plaintiff's due process rights by promulgating and approving TDOC policies 404.11 and 401.05, which authorize the classification and housing of pretrial detainees, including Plaintiff, in punitive conditions of confinement, absent due process protections, and prior to an adjudication of guilt.

91.     TDOC policies 404.11 and 401.05 are facially unconstitutional as they authorize pretrial detainees to be classified and housed in punitive conditions of confinement, absent due process protections and prior to an adjudication of guilt.

92.     Alternatively, TDOC policies 404.11 and 401.05 are unconstitutional as applied to Plaintiff, as they authorized the classification and housing of Plaintiff in punitive conditions of

confinement, absent due process and prior to an adjudication of guilt.

## PRAYER FOR RELIEF

93. Plaintiff requests:

   a. That a jury of 12 persons be empaneled to try this case;

   b. A declaratory judgment that Defendants' conduct violated Plaintiff's protected constitutional rights;

   c. For compensatory damages in an amount to be determined at trial;

   d. Reasonable attorney's fees and litigation expenses pursuant to 42 U.S.C. § 1988;

   e. An injunction ordering Defendants to house Plaintiff in general population or similar reasonable, non-punitive housing at RMSI; and

   f. Such other relief as the Court deems equitable and just.

## VERIFICATION

I declare under penalty of perjury that the foregoing is true and correct

based on my personal knowledge, except where indicated it is based upon

information and belief.

9/9/21

Alexander Friedmann                              DATE

Respectfully submitted,

DAVID RANDOLPH SMITH & ASSOCIATES

By:   /s/ Christopher Smith

Christopher W. Smith, TN BPR #034450
csmith@drslawfirm.com
David Randolph Smith, TN BPR #011905
drs@drslawfirm.com
Dominick R. Smith. TN BPR #028783
dom@drslawfirm.com
W. Lyon Chadwick. Jr. TN BPR #029599
lyon@drslawfirm.com
1913 21st Avenue South
Nashville, Tennessee 37212
615-742-1775 phone
615-742-1223 fax
drslawfirm.com

*Attorneys for Plaintiff*