UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| ALEXANDER FRIEDMANN, | ) |
|---|---|
| Plaintiff, | ) |
| v. | ) NO. 3:21-cv-00721 |
| TONY PARKER, et al., | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Alexander Friedmann is a pretrial detainee who has spent 21 months in solitary confinement in the Tennessee Department of Correction ("TDOC"). He is suing several TDOC officials ("Defendants") under 42 U.S.C. § 1983, alleging his conditions of confinement amount to unconstitutional pretrial punishment. He has moved for a preliminary injunction requiring that Defendants remove him from isolation. (Doc. No. 12). The Court will grant the motion.

**I.    BACKGROUND**

Mr. Friedmann is charged with vandalizing a detention center overseen by the Davidson County Sheriff's Office ("DCSO"). (Compl. ¶ 13).[1] He allegedly entered the center while it was under construction and concealed firearms and other contraband in its walls using power tools. (Id.; Doc. No. 15-2 at 2). According to Defendants, Mr. Friedmann "masquerad[ed] as a construction worker" to gain access to the construction site. (Doc. No. 15 at 2, 13).

---

[1] References to "Compl." or the "Complaint" are to Mr. Friedmann's verified complaint. (Doc. No. 1). Courts "may consider the entire record," including verified complaints and "other hearsay evidence," in issuing preliminary injunctions. Patel v. AR Grp. Tenn., No. 3:20-CV-00052, 2020 WL 5849346, at *4 (M.D. Tenn. Oct. 1, 2020); Advoc. Cap., Inc. v. L. Off. of A. Clark Cone, No. 3:06-0847, 2006 WL 3469576, at *2 (M.D. Tenn. Nov. 29, 2006). For its factual findings, the Court relies on the Complaint, the parties' affidavits, and other credible evidence in the record.

The DCSO took Mr. Friedmann into custody based on the alleged vandalism in February 2020. (Compl. ¶ 11; Doc. No. 15-2 at 7). It then applied to have Mr. Friedmann moved to the TDOC for safekeeping pending trial. (Doc. No. 15-1 at 1). Judge Cheryl Blackburn of the Davidson County Criminal Court granted the application and ordered Mr. Friedmann's transfer. (Id.). The TDOC took custody of Mr. Friedmann on February 19, 2020 and placed him at the Riverbend Maximum Security Institution ("RMSI"). (Compl. ¶ 14).

The RMSI has several housing units. (Id. ¶¶ 16–17). Unit 1 is the most restrictive. (Id. ¶ 16). There, prisoners are held in solitary confinement and "remain in their cells 23 hours a day on weekdays and 24 hours a day on weekends and holidays." (Id. ¶ 31). Inmates in Unit 1 are "limited to noncontact visits with attorneys, clergy, and . . . immediate family members." (Id. ¶ 35). And they are "restricted in the items [they] can purchase from the RMSI commissary." (Id. ¶ 36). When Mr. Friedmann arrived at the RMSI, Unit 1 contained 96 cells. (Id. ¶ 18). Two of them, referred to as "iron man" cells, were even more restrictive than the rest.[2] (Id.). Mr. Friedmann was immediately assigned to an iron man cell in Unit 1. (Id. ¶ 24).

Iron man cells have several features that distinguish them. Their walls and ceilings are made of welded steel plates. (Id. ¶ 21). They "contain only a steel-plate bench for a bed; a steel combination sink and toilet; a shower head mounted on one wall and a drain in the floor." (Id. ¶ 23). The cells "have no shelves to store personal belongings . . . no electric outlet (and thus no

---

[2] In the Answer to the Complaint, Defendants deny that two cells are "known or referred to as . . . 'iron man' cells," that "Unit 1 has 'iron man' cells," and that Mr. Friedmann's "cell is an 'iron man' cell." (Doc. No. 16 ¶¶ 18, 41). This is remarkable given Defendants' own exhibits contain a TDOC report *signed by multiple Defendants* that describes Mr. Friedmann's cell as "an iron man cell." (Doc. No. 15-4 at 15). The Court resolves "disputed" facts in Mr. Friedmann's favor where the record contradicts Defendants' denials. The Court warns Defendants there may be repercussions for future blatant factual misrepresentations presented to it. See Fed. R. Civ. P. 11.

ability to use basic appliances such as televisions and lamps); no steel wall mirror for personal grooming; no table to write on; and no stool to sit on." (Id. ¶ 19). In comparison, "condemned prisoners on Death Row in Unit 2 at [the] RMSI are housed in cells that have stools, tables, shelves, mirrors, regular size windows, and electric outlets so they can watch television and use other plug-in appliances." (Id. ¶ 50). Iron man cells are also darker than regular cells; they have vertical slit windows less than two inches wide and are painted dark gray (instead of white, like other cells). (Id. ¶ 22). And iron man cells are colder than regular cells. (Id. ¶ 21). The "steel plates absorb and retain cold temperatures . . . particularly during the winter months."[3] (Id.).

Mr. Friedmann has remained in an iron man cell for nearly two years, with two exceptions. (Id. ¶ 24). In January 2021, Mr. Friedmann spent a week in federal custody at the Grayson County Detention Center ("GCDC") in Kentucky. (Id. ¶ 45). There, he was "housed in a communal cell with 9 to 15 other prisoners . . . without incident." (Id. ¶ 46). When Mr. Friedmann returned to the RMSI, he was kept in the prison infirmary in a standard cell during a 14-day quarantine period. (Id. ¶ 47). This period also passed "without incident." (Id.).

According to Mr. Friedmann, he is suffering psychological symptoms due to his confinement in the iron man cell. (Id. ¶ 53). They include depression, stress, anxiety, insomnia, fatigue, memory loss, and loss of concentration. (Id.). Mr. Friedmann is also suffering physical injuries, including weight loss; back problems from sleeping on the steel-plated bed; and eye strain,

---

[3] Defendants contest certain portions of Mr. Friedmann's description of his cell. (E.g., Doc. No. 15 at 5 (claiming Mr. Friedmann's "cell is not appreciably colder than other cells")). But declarations submitted by other Unit 1 prisoners validate Mr. Friedmann's claims. (Doc. No. 18-1 at 1–9). And Defendants do not contest the facts at the heart of Mr. Friedmann's lawsuit, i.e., that Mr. Friedmann has been continuously held in solitary confinement in a steel-plated cell with restricted access to social and mental stimulation. (Doc. No. 16 ¶¶ 21, 26, 32–37, 59).

3

blurred vision, and headaches from the poor lighting in his cell. (Id. ¶¶ 53, 71, 77).

On September 16, 2021, Mr. Friedmann filed the instant suit against TDOC Commissioner Tony Parker, RMSI Warden Tony Mays, and RMSI employees Michael Keys, George Firestine, and Celesta Williams. (Doc. No. 1). He moved for a preliminary injunction on October 12, 2021. (Doc. No. 12). The parties agreed their filings would be sufficient to resolve Mr. Friedmann's motion. (Doc. No. 14). The motion has been fully briefed. (Doc. Nos. 12, 15, 18).

## II.  LEGAL STANDARD

"A district court must consider four factors when determining whether to grant or deny a preliminary injunction: (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff may suffer irreparable harm absent the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of an injunction upon the public interest." Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty., 274 F.3d 377, 400 (6th Cir. 2001). Generally, these "four considerations are factors to be balanced, not prerequisites that must be met." Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp., 511 F.3d 535, 542 (6th Cir. 2007) (citation and quotation omitted). However, the irreparable injury factor is "indispensable." D.T. v. Sumner Cty. Sch., 942 F.3d 324, 327 (6th Cir. 2019).

A preliminary injunction is an "extraordinary remedy." Patel, 2020 WL 5849346, at *5. Plaintiffs seeking preliminary injunctions must present "more than 'scant evidence' to substantiate their allegations."[4] Id. at *4 (quoting Libertarian Party of Ohio v. Husted, 751 F.3d 403, 417 (6th Cir. 2014)). Whether to grant an injunction is "within the discretion of the district court." Id.

---

[4] Mr. Friedmann submitted numerous exhibits to support his allegations, including third-party declarations, letters from Defendants, medical records, grievance forms, and TDOC reports. (E.g., Doc. Nos. 18-1, 18-2, 18-3, 18-4, 18-5, 18-6, 18-7, 18-8, 18-9, 18-10, 18-11, 18-12).

## III. ANALYSIS

The Court applies the preliminary injunction factors below. It finds each factor weighs in favor of granting Mr. Friedmann relief. The Court will issue an injunction requiring that Defendants remove Mr. Friedmann from solitary confinement.

### A. Mr. Friedmann Is Likely to Succeed on the Merits of His Claim.

Mr. Friedmann will likely prevail in his § 1983 lawsuit. Under § 1983, prisoners may sue state officials who deprive them of their constitutional rights. Hardin v. Straub, 954 F.2d 1193, 1198 (6th Cir. 1992). The record shows (1) Defendants are depriving Mr. Friedmann of his constitutional rights and (2) Defendants' counterarguments are unavailing.

#### 1. *Mr. Friedmann Is Suffering Ongoing Deprivations of His Constitutional Rights.*

Mr. Friedmann contends his conditions of confinement violate his constitutional rights under the Fourteenth Amendment's Due Process Clause. (Compl. ¶ 85). The Due Process Clause protects detainees from being "punished prior to an adjudication of guilt." Bell v. Wolfish, 441 U.S. 520, 535 (1979); see also Thompson v. Cty. of Medina, 29 F.3d 238, 242 (6th Cir. 1994). Pretrial detainees can demonstrate they are being "subjected to unconstitutional punishment" by showing a "restriction or condition" of their confinement "is not rationally related to a legitimate government objective or is excessive in relation to that purpose."[5] J.H. v. Williamson Cty., 951 F.3d 709, 717 (6th Cir. 2020) (quoting Bell, 441 U.S. at 538); Williamson v. Stirling, 912 F.3d 154, 185 (4th Cir. 2018). To determine if a condition of confinement is "excessive," courts analyze the "totality of [the] circumstances." J.H., 951 F.3d at 718. The totality of the

---

[5] Detainees may also demonstrate unconstitutional pretrial punishment by showing "an expressed intent to punish on the part of detention facility officials." Bell, 441 U.S. at 538.

5

circumstances shows Mr. Friedmann's conditions of confinement are excessive relative to Defendants' goals of maintaining prison security and ensuring Mr. Friedmann's presence at trial. (See Doc. No. 15 at 14).

*First*, the "nature" of Mr. Friedmann's confinement is excessively harsh. J.H., 951 F.3d at 718. His cell is barren. (See Compl. ¶ 23). It is darker and colder than other cells. (Id. ¶¶ 21–22). Mr. Friedmann does not have a table or a stool. (Id. ¶ 19). He is isolated for 23 to 24 hours per day. (Id. ¶ 31). He is denied personal items and means of intellectual stimulation that are afforded to other inmates. (Id. ¶¶ 36–37). Even prisoners who have been convicted and sentenced to death are housed more humanely than Mr. Friedmann. (See id. ¶ 50; Doc. No. 16 ¶ 50). Courts have held pretrial detainees kept in similar conditions suffered unconstitutional punishment. United States v. Gotti, 755 F. Supp. 1159, 1160, 1165 (E.D.N.Y. 1991) (pretrial detainees isolated "in a small cell with inadequate lighting for 23 hours each day" suffered unconstitutional punishment); see also Stirling, 912 F.3d at 179 (a jury could "readily" find a pretrial safekeeper isolated and "restricted to his cell twenty-three hours a day, with minimal access to books, phones, or any human contact" was unconstitutionally punished); J.H., 951 F.3d at 719 (pretrial detainee who was "completely isolated" from other prisoners was unconstitutionally punished, assuming the truth of his allegations). The nature of Mr. Friedmann's segregation supports a finding that his conditions of confinement are punitive.

*Second*, the "duration" of Mr. Friedmann's isolation appears excessive. J.H., 951 F.3d at 718. Short stays in unpleasant conditions may not amount to punishment. See Bell, 441 U.S. at 543 ("We simply do not believe that requiring a detainee to share toilet facilities and [an] admittedly rather small sleeping place with another person for generally a maximum period of 60

6

days violates the Constitution."). However, even for convicted prisoners, "prolonged or indefinite confinement in . . . segregation may implicate due process considerations." Bishawi v. Ne. Ohio Corr. Ctr., 628 F. App'x 339, 344 (6th Cir. 2014). And isolating a pretrial detainee for nine months "smacks of punishment." Covino v. Vt. Dep't of Corr., 933 F.2d 128, 130 (2d Cir. 1991); cf. Shuler v. Hall, No. 3:18-CV-01223, 2019 WL 1777899, at *5 (M.D. Tenn. Apr. 23, 2019) (pretrial detainee's case survived because the "six-month duration of Plaintiff's solitary confinement" may have "carried it into the realm of punishment to which a pretrial detainee may not constitutionally be subjected"). Mr. Friedmann has been segregated for more than twice that period, with no end in sight. (Compl. ¶ 24; Doc. No. 16 ¶ 24). That indicates he is suffering pretrial punishment.

*Third*, a review of Mr. Friedmann's behavioral record highlights the excessive nature of his solitary confinement. An inmate's "disciplinary infraction[s]" may warrant segregation. J.H., 951 F.3d at 718. But if a prisoner's solitary confinement is harsh "relative to his infractions," that is evidence of "unconstitutional punishment." Stirling, 912 F.3d at 180. Mr. Friedman avers he has committed no behavioral infractions at the RMSI. (Compl. ¶ 28). And Defendants have raised no contrary evidence. In fact, Defendants admit Mr. Friedmann has no "history of institutional violence, escape or attempted escape." (Doc. No. 16 ¶ 28). Yet, they have nevertheless placed him in an iron man cell longer than any previous inmate, with the exception of Curtis Ray Watson, "a convicted TDOC prisoner accused of sexually assaulting and murdering TDOC administrator Debra Johnson after his escape from a state prison in August 2019." (Compl. ¶ 42; Doc. No. 16 ¶ 42). This bolsters Mr. Friedmann's argument that he is suffering unconstitutional punishment.

7

*Fourth*, Mr. Friedmann's conditions of confinement appear punitive in view of the purpose for which iron man cells have traditionally been used. Restrictions applied to pretrial detainees are more likely to constitute unlawful punishment where they have "historically been regarded as a punishment." Bell, 441 U.S. at 537 (quotation omitted). Iron man cells are regarded in precisely that manner. Several RMSI prisoners submitted declarations stating that iron man cells are "usually used for inmates with serious behavioral issues" as "punishment" for infractions. (Doc. No. 18-1 at 1; see also id. at 2 ("The iron man cells are an extreme form of punishment used for the most unruly inmates."); id. at 4 ("The iron man cells are usually used to house violent, out-of-control inmates."); id. at 6 ("In theory, the iron man cells are used to house problematic prisoners and those with behavior issues.")). According to the declarations, "most inmates are housed [in iron man cells] for a short time, either a few days or up to 2–3 weeks." (Id. at 1). Defendants themselves appear to acknowledge that a prisoner's stay in an iron man cell is often tied to the prisoner's behavioral record. When Mr. Friedmann wrote to Defendant Keys and asked "what [he] need[ed] to do" to be removed from his iron man cell, Defendant Keys responded that Mr. Friedmann should "continue [his] good behavior and conduct." (Doc. No. 18-7 at 1). The record evidence showing iron man cells are traditionally used to punish inmates indicates Mr. Friedmann's stay in an iron man cell is punitive.

*Fifth*, Defendants' stated purposes for segregating Mr. Friedmann do not justify the extreme conditions of his confinement. Defendants claim isolating Mr. Friedmann will help "ensure his presence at trial" and maintain the RMSI's "security and safety." (Doc. No. 15 at 14). Fair enough. But "loading a detainee with chains and shackles and throwing him in a dungeon" would also "ensure his presence at trial and preserve the security of the institution." Bell, 441

8

U.S. at 539 n.20. Yet, the Constitution does not permit "conditions so harsh . . . to achieve objectives that could be accomplished in so many alternative and less harsh methods." Id. Here, it defies reason to imagine the RMSI cannot ensure Mr. Friedmann's presence at trial through measures less restrictive than those he faces in an iron man cell.[6] And Defendants' argument that Mr. Friedmann is a security threat is undermined by his lack of disciplinary infractions at the RMSI (Compl. ¶ 28); his recent good behavior in a communal setting in the GCDC (id. ¶ 46); his positive conduct in a standard medical cell during quarantine (id. ¶ 47); and Defendants' own admissions that Mr. Friedmann has shown "good behavior" while in custody (Doc. No. 18-7 at 1). See Stirling, 912 F.3d at 179. Finally, although the charges against Mr. Friedmann are serious, that alone does not justify placing him in indefinite isolation. Gotti, 755 F. Supp. at 1160, 1165 (alleged organized crime leaders who were kept in segregation before trial suffered unconstitutional punishment where they had committed no acts in custody indicating they were security threats); United States v. Bout, 860 F. Supp. 2d 303, 305, 308 (S.D.N.Y. 2012) (prisoner convicted of terrorism charges could not be held in indefinite segregation). Defendants' stated purposes for isolating Mr. Friedmann do not validate the conditions of his confinement.

The totality of the circumstances demonstrates Mr. Friedmann is suffering unconstitutional pretrial punishment because his solitary confinement is excessive in relation to its purposes.

---

[6] Defendants imply an iron man cell is required to prevent Mr. Friedmann's escape based on allegations that he snuck into a detention center before it opened and dug into its walls. (Doc. No. 15 at 5). But entering restricted areas is not the same as breaking out of prisons. Defendants' logic would require the RMSI to throw all inmates accused of burglaries into indefinite solitary confinement in iron man cells. Using an iron man cell to prevent Mr. Friedmann's potential escape, especially where he has never attempted an institutional escape, is an "exaggerated response to speculative security objectives, and, therefore it [is] invalid." Flagner v. Wilkinson, 241 F.3d 475, 487 (6th Cir. 2001) (citation and quotation omitted); see also Bell, 441 U.S. at 562.

### 2. *The Law Does Not Support Defendants' Argument that Mr. Friedmann Is Unlikely to Succeed on the Merits of His Claim.*

Defendants contend Mr. Friedmann will not prevail in his § 1983 lawsuit because he cannot show deprivations of his constitutional rights. (Doc. No. 15 at 9–21). Defendants' arguments are unavailing.

Defendants argue that Mr. Friedmann cannot show his conditions of confinement are punitive because prison officials are entitled to broad deference in implementing prison policies. (Id. at 14–15). True, courts defer to prison administrators on the "policies and practices" needed "to maintain institutional security." J.H., 951 F.3d at 718 (quoting Bell, 441 U.S. at 547). But "this deference has its limits." Id.; see also Gotti, 755 F. Supp. at 1164 (citation and quotation omitted) (prison authorities "are not afforded unbridled discretion"); Whitney v. Brown, 882 F.2d 1068, 1074 (6th Cir. 1989) ("[P]rison officials do not set constitutional standards by fiat."). Courts need not rubber stamp prison policies if the record indicates they are excessive relative to theoretical security concerns. Bell, 441 U.S. at 562; Flagner, 241 F.3d at 483; Whitney, 882 F.2d at 1078; Bout, 860 F. Supp. 2d at 311 ("Although I recognize that courts are loathe to interfere with questions of prison administration . . . I cannot shirk my duty under the Constitution . . . to ensure that Bout's confinement is not arbitrarily and excessively harsh."). That is precisely what the record indicates here.[7] See supra Section III.A.1. The Court rejects Defendants' argument that the deference owed to prison officials will prevent Mr. Friedmann from succeeding in his

---

[7] In fact, on prior occasions, Defendants appear to have contradicted the position offered in their brief regarding the security concerns presented by Mr. Friedmann. Defendant Williams wrote to Mr. Friedmann that if she "had to classify you, you would be a 2." (Doc. No. 18-15 at 1). This seems to refer to the scoring system on the Custody Assessment Form ("CAF"), which is used to provide an "objective foundation for determining custody levels." (Doc. No. 18-4 at 4). A score of "2" on the CAF corresponds with a "minimum" security classification. (Id. at 2).

§1983 claim.

Defendants also contend that Mr. Friedmann will not prevail in his lawsuit because, irrespective of the deference owed to prison officials, security concerns justify Mr. Friedmann's segregation. (See Doc. No. 15 at 14). As discussed, the Court disagrees. See supra Section III.A.1.

Additionally, Defendants argue Mr. Friedmann cannot succeed in his claim because he is unable to demonstrate a violation of his Eighth Amendment rights. (Doc. No. 15 at 15). According to Defendants, "a pretrial detainee's due process claim concerning conditions-of-confinement" is analyzed "in the same way as a prisoner's Eighth Amendment conditions-of-confinement claim." (Id.). Not so. Bell, 441 U.S. at 537 n.16 ("The Court of Appeals properly relied on the Due Process Clause rather than the Eighth Amendment in considering the claims of pretrial detainees."). A detainee's conditions-of-confinement claim *may* implicate the Eighth Amendment. Thompson, 29 F.3d at 242 (inmates awaiting trial are "entitled to the same Eighth Amendment rights as other inmates"). But pretrial detainees have a right to be free of punitive conditions of incarceration regardless of whether those conditions are cruel and unusual; indeed, "pretrial detainees (unlike convicted prisoners) cannot be punished at all." Kingsley v. Hendrickson, 576 U.S. 389, 400 (2015); Bell, 441 U.S. at 537 n.16 ("Due process requires that a pretrial detainee not be punished. A sentenced inmate, on the other hand, may be punished, although that punishment may not be 'cruel and unusual' under the Eighth Amendment."). Defendants' argument that Mr. Friedmann cannot establish an Eighth Amendment violation is

11

immaterial because he need not satisfy the Eighth Amendment to prevail in his due process claim.[8]

Defendants also assert Mr. Friedmann cannot succeed in his lawsuit because Judge Blackburn's "safekeeping" order justifies Mr. Friedmann's isolation. (Doc. No. 15 at 3, 13). But Judge Blackburn did not require that Defendants house Mr. Friedmann in solitary confinement. (Doc. No. 15-1 at 1). She merely ordered Mr. Friedmann's transfer to the TDOC pending trial, determining that no "county jail" would be sufficient for his safekeeping. (Id.). Defendants' argument that Judge Blackburn's order will prevent Mr. Friedmann from succeeding in his lawsuit is without merit.

Finally, Defendants contend 42 U.S.C. § 1997e(e) will stop Mr. Friedmann from succeeding in his claim. (Doc. No. 15 at 16). Section 1997e(e) is captioned "[l]imitation on recovery" and states that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act." 42 U.S.C. § 1997e(e). Mr. Friedmann does not allege a sexual act and Defendants argue his claim will fail because he also cannot meet § 1997e(e)'s physical injury requirement. (Doc. No. 15 at 16).

Defendants' argument falls short because § 1997e(e) does not apply to Mr. Friedmann's requests for declaratory and injunctive relief. (Compl. ¶ 93). According to "all the circuits to have addressed the issue . . . Section 1997e(e) does not prevent a prisoner from obtaining injunctive or declaratory relief." Thompson v. Carter, 284 F.3d 411, 418 (2d Cir. 2002). Those circuits

---

[8] Defendants use Villegas v. Metropolitan Government of Nashville, 709 F.3d 563 (6th Cir. 2012) to support their argument that the Eighth Amendment framework applies to Mr. Friedmann's due process claim. (Doc. No. 15 at 15). But that case only applied the Eighth Amendment's standard because the plaintiff was explicitly "claiming violations of her Eighth Amendment rights (made applicable to pretrial detainees through the Fourteenth Amendment)." Villegas, 709 F.3d at 566.

have made clear that "§ 1997e(e)'s physical-injury requirement applies only to bar recovery of monetary damages." Cheatham v. Haye, No. 2:19-CV-10480, 2020 WL 3481645, at *3 (E.D. Mich. June 26, 2020) (citing decisions from the Second, Fifth, Seventh, and D.C. Circuits). Although the Sixth Circuit has not "squarely addressed" this issue, id., the Court agrees with the reasoning used in circuits across the country. "Both in its text and in its caption, Section 1997e(e) purports only to limit recovery for emotional and mental injury, not entire lawsuits. Therefore, it does not prevent [Mr. Friedmann] from vindicating his constitutional right[s] . . . by injunctive and declaratory relief." Thompson, 284 F.3d at 418; see also Herman v. Holiday, 238 F.3d 660, 665 (5th Cir. 2001).

Even if § 1997e(e) did apply to claims for declaratory and injunctive relief, it would not prevent Mr. Friedmann from succeeding on the merits of his claim. He has experienced physical injuries to his back, as well as "abnormal weight loss" and vision problems.[9] (Compl. ¶¶ 53, 71, 77; Doc. No. 15-5 at 5). These injuries are enough to sustain Mr. Friedmann's claim, given "the physical injury required by § 1997e(e) for a § 1983 claim need not be significant." Flanory v. Bonn, 604 F.3d 249, 254 (6th Cir. 2010) (holding an inmate suffered physical injury under § 1997e(e) where "the deprivation of toothpaste" caused him gum disease and the loss of one tooth); Cheatham, 2020 WL 3481645, at *2 (noting "courts have found physical injury based on weight loss alone"); Ward v. Aramark Corr. Food Serv., No. 3:09CV-P802-S, 2011 WL 1542108, at *3 (W.D. Ky. Apr. 22, 2011) (holding that the plaintiff's claim survived dismissal under § 1997e(e)

---

[9] Mr. Friedmann's back issues appear to be the most serious. He "suffered a herniated disc that required emergency room care and follow-up medical treatments, including intra-spinal steroid injections," prior to incarceration. (Compl. ¶ 71). He states that "sleeping on the steel-plate bench" in his cell exacerbated his back issues and he "repeatedly requested medical care" but only received a "thin foam mattress. . . 100 days after first requesting care." (Id. ¶¶ 72–74).

13

where his "medical records show[ed] weight loss").

In sum: Mr. Friedmann is likely to succeed in his claim that his conditions of confinement violate the prohibition on pretrial punishment despite Defendants' counterarguments.[10]

B. <u>Mr. Friedmann Faces Irreparable Harm Absent an Injunction.</u>

Mr. Friedmann is suffering irreparable harm. The "loss of constitutional rights is presumed to constitute irreparable harm." <u>Doe by & through Frazier v. Hommrich</u>, No. 3-16-0799, 2017 WL 1091864, at *2 (M.D. Tenn. Mar. 22, 2017); <u>Overstreet v. Lexington-Fayette Urb. Cty. Gov't</u>, 305 F.3d 566, 578 (6th Cir. 2002). And the Court has already found Mr. Friedmann's conditions of confinement violate his due process rights. <u>See</u> <u>supra</u> Section III.A.

Defendants' counterarguments fail. Defendants do not address Mr. Friedmann's contention that they are violating his constitutional rights in the section of their brief addressing irreparable injury. (Doc. No. 15 at 21–23). They merely claim that the physical and mental harms Mr. Friedmann faces in solitary confinement are not irreparable. (<u>Id.</u>). The Court is not persuaded by this argument. <u>See</u> <u>Doe</u>, 2017 WL 1091864, at *2 ("The harm suffered in solitary confinement is not harm easily undone."). But even if Defendants' argument was correct it would not cast doubt on the Court's irreparable injury finding because "a violation of constitutional rights

---

[10] The Court has focused on Mr. Friedmann's substantive due process rights, which both parties aver are the crux of Mr. Friedmann's injunction request. (<u>See</u> Doc. No. 15 at 21; Doc. No. 18 at 1). However, the Court notes the Complaint also raises a procedural due process claim based on Mr. Friedmann's allegations that, in the TDOC inmate classification process, convicted prisoners are given more rights (such as the ability to participate in classification hearings) than pretrial detainees. (Compl. ¶¶ 65–66). These allegations are disconcerting, given the "procedural protections afforded convicted prisoners inform the minimum standards for procedures that accompany the administrative segregation of pretrial detainees." <u>Stirling</u>, 912 F.3d at 183; <u>see also</u> <u>Bell</u>, 441 U.S. at 545 (noting that "pretrial detainees . . . retain at least those constitutional rights that we have held are enjoyed by convicted prisoners").

14

*alone* can demonstrate that the absence of an injunction will cause irreparable harm." Memphis Ctr. for Reprod. Health v. Slatery, 14 F.4th 409, 436 (6th Cir. 2021) (emphasis added); see also Overstreet, 305 F.3d at 578.

      C.      <u>An Injunction Will Not Cause Substantial Harm to Others.</u>

The record does not indicate that Defendants, or other individuals, will suffer substantial harm from an injunction requiring that Mr. Friedmann be removed from solitary confinement. Mr. Friedmann's behavioral record does not show he is a threat to prison staff, other inmates, or anyone else. (See Compl. ¶¶ 28, 46–47; Doc. No. 16 ¶ 28; Doc. No. 18-7 at 1). Plus, if he presents such a threat "in the future," Defendants are "not precluded from imposing such conditions or restrictions" that are "appropriate" on Mr. Friedmann (including solitary confinement, if required) consistent with constitutional standards. Gotti, 755 F. Supp. at 1165. And to the extent altering Mr. Friedmann's confinement conditions will create administrative inconvenience, that certainly does not justify the intrusion on his due process rights caused by his segregation. See Doe, 2017 WL 1091864, at *3 ("If there is a continuing constitutional violation occurring, then the harms to Plaintiffs certainly outweigh any harm to Defendants.").

Defendants do not offer any convincing counterargument. They assert that Mr. Friedmann presents risks to the RMSI's inmates and staff based on the charges pending against him and his "prior criminal convictions of armed robbery, assault with intent to commit first degree murder and attempted aggravated robbery." (Doc. No. 15 at 23). The Court has already found that serious pending criminal charges do not per se warrant indefinite segregation.[11] See Gotti, 755

---

[11] It is clear Mr. Friedmann's segregation is "indefinite" given the length of the segregation and Defendants' representation to the Court that Mr. Friedmann's isolation will not end prior to the "conclusion of his state criminal trial." (Doc. No. 15 at 20 n.5).

15

F. Supp. at 1160, 1165. Similarly, an inmate's prior convictions of grave offenses will not automatically justify placing the inmate in indeterminate isolation. See Bout, 860 F. Supp. 2d at 305, 308 (holding an inmate could not be held in indefinite solitary confinement even after he was convicted for "his participation in conspiracies to (1) kill United States nationals, (2) kill officers and employees of the United States, (3) acquire, transfer, and use antiaircraft missiles, and (4) provide material support to a designated foreign terrorist organization"). This is especially compelling where, as here, the inmate's prior convictions are from *thirty years* ago (in 1989 and 1992). (Doc. No. 15-2 at 13). Defendants' arguments fail to undermine the Court's finding that removing Mr. Friedmann from segregation will not substantially harm any third party.

        D.        The Public Interest Favors an Injunction.

Finally, public interest considerations weigh in favor of granting Mr. Friedmann's request for relief. It is "always in the public interest to prevent the violation of a party's constitutional rights." Liberty Coins, LLC v. Goodman, 748 F.3d 682, 690 (6th Cir. 2014) (citation and quotation omitted); G & V Lounge, Inc. v. Mich. Liquor Control Comm'n, 23 F.3d 1071, 1079 (6th Cir. 1994). Hence, it is in the public interest that the Court issue a preliminary injunction requiring that Defendants house Mr. Friedmann in conditions that comply with his rights under the Fourteenth Amendment's Due Process Clause. Defendants' counterarguments are unavailing because they (1) presume there is no constitutional violation and (2) advance arguments the Court has already rejected. (Doc. No. 15 at 23–24 (contending Judge Blackburn's safekeeping order, the allegations against Mr. Friedmann, safety considerations, and security concerns justify Mr. Friedmann's continued segregation)).

16

## IV. CONCLUSION

For the foregoing reasons, Mr. Friedmann's Motion for Preliminary Injunction (Doc. No. 12) will be granted.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

17

Case 3:21-cv-00721   Document 20   Filed 11/23/21   Page 17 of 17 PageID #: 361